1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8  LEAGUE TO SAVE LAKE TAHOE, a
   California non-profit corporation,

9
                              Plaintiff,

10                                                          3:09-cv-478-RCJ-RAM

                v.
11                                                          **ORDER**

12  TAHOE REGIONAL PLANNING AGENCY,
    a separate legal entity created by bi-state
13  compact approved by the United States
    Congress; SIERRA COLINA, LLC, a Nevada
14  limited liability corporation; and QMO, LLC,
    a Delaware limited liability corporation,
15
                              Defendants.
16
    _____

17

18          Currently before the Court are Sierra Colina Defendants' Motion for Summary Judgment

19  (#37); Plaintiff's Motion for Summary Judgment (#38); Plaintiff's Motion for Permanent

20  Injunction (#41); Defendant Tahoe Regional Planning Agency's ("TRPA") Motion for Summary

21  Judgment (#42); and Tyrone Polastri's Motion for Leave to File an Amicus Curiae Brief (#58).

    The Court heard oral argument on August 1, 2011.
22

23                              **JURISDICTION & STANDING**

24          The Court has federal jurisdiction to hear this case pursuant to 28 U.S.C. § 1331.  *See*

25  *League to Save Lake Tahoe v. B.J.K. Corp.*, 547 F.2d 1072, 1075 (9th Cir. 1976) (holding that

26  questions concerning the interpretation and application of the Tahoe Regional Planning

27  Agency's ordinances present federal questions under 28 U.S.C. § 1331(a)).  The Court finds

    that Plaintiff League to Save Lake Tahoe ("Plainiff" or "League") has associational standing
28
    to bring this lawsuit.  *See Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Regional*

*Planning Agency*, 365 F.Supp.2d 1146, 1161-62, 1164 n.11 (D. Nev. 2005) (finding that the Committee had associational standing to challenge whether the Tahoe Regional Planning Agency was required to prepare an environmental impact statement under its Code of Ordinances and its Compact); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992); (*see* Nason Decl. (#44); Donohoe Decl. (#45)).

**BACKGROUND**

**I.    Complaint**

On August 21, 2009, Plaintiff filed a complaint for declaratory and injunctive relief against Defendants Tahoe Regional Planning Agency ("TRPA") and Sierra Colina, LLC, Sierra Colina Village, LLC, and QMO, LLC (collectively "Sierra Colina Defendants"). (Compl. (#1) at 1). Plaintiff brought this action to challenge the TRPA's June 24, 2009, approval of the Sierra Colina Village Project ("Project"). (*Id.* at 3).

Plaintiff alleged three causes of action in its complaint. (*Id.* at 16-22). In the first cause of action, Plaintiff alleged that the TRPA abused its discretion and failed to proceed in manner required by law when it approved the Project and the provision that found that the Project's access road was a Linear Public Facility ("LPF") despite the fact that the road did not comply with the LPF definition in the TRPA Code of Ordinances. (*Id.* at 19). Plaintiff challenges the designation of LPF 3. In the second cause of action, Plaintiff alleged that the TRPA abused its discretion and failed to proceed in a manner required by law when it approved the Project because at least three of the four elements required by TRPA Code § 20.3.B(4) had not been satisfied. (*Id.* at 22). In the third cause of action, if this Court remanded the action, Plaintiff sought a writ of certiorari, pursuant to NRS § 34.020, to be issued against the TRPA directing the TRPA to deny the Project as proposed. (*Id.* at 22-23). Plaintiff sought the following relief: (a) issuance of a preliminary and permanent injunction prohibiting the Sierra Colina Defendants from taking any action in furtherance of the Project; (b) issuance of a declaratory order setting aside and directing the TRPA to set aside all Project approvals and permits at issue in the action; (c) issuance of a declaratory order that the TRPA's decision to approve the

1    Project violated the TRPA Code because the TRPA abused its discretion by approving the
2    Project's access road as a LPF and by approving the transfer of land coverage for the access
3    road under TRPA Code § 20.3.B(4); (d) issuance of a peremptory writ of certiorari ordering the
4    TRPA to set aside the Project approvals, permits, and environmental impact statement ("EIS")
5    at issue in this action; and (e) award costs. (*Id.* at 23).

6    **II.    Tahoe Regional Planning Compact**

7        In 1968, the Nevada and California State Legislatures adopted the Tahoe Regional
8    Planning Compact ("Compact"), which Congress approved in 1969. (*See* TRPA's Mot. for
9    Summ. J. (#42) at 9). In 1980, the Nevada and California State Legislatures, with the approval
10   of Congress, adopted an extensive amendment to the Compact, whose purpose was "to
11   encourage the wise use and conservation of the waters of Lake Tahoe and of the resources
12   of the area around said lake." (*See* Compact (#39-2) at 3).[1]  The Compact established the
13   TRPA and coffered the agency with the power "to establish environmental threshold carrying
14   capacities and to adopt and enforce a regional plan and implement[] ordinances which [would]
15   achieve and maintain such capacities while providing opportunities for orderly growth and
16   development consistent with such capacities." (*Id.* at 4).

17       The TRPA has established environmental thresholds for the Region's air, water, soil,
18   scenic, recreational, and other resources, has adopted a Regional Plan, and has implemented
19   ordinances to achieve and maintain the thresholds. (*Id.*).  The Compact recognized that in
20   order to preserve the scenic beauty and outdoor recreational opportunities of the Region the
21   TRPA needed to insure an equilibrium between the Region's natural endowment and its
22   manmade environment. (*Id.*).  The TRPA may only approve projects that it finds comply with
23   the Regional Plan, ordinances, rules, and regulations, and only after it makes certain written
24   findings based on substantial evidence in the record. (*Id.* at 12).

25

26       [1] Plaintiff filed a request for judicial notice and attached relevant sections of the TRPA
     Code of Ordinances, the Tahoe Regional Planning Compact ("Compact"), and the TRPA
27   Water Quality Management Plan. (First Request for Judicial Notice (#39)). The Court grants
     judicial notice of these documents. *See Disabled Rights Action Comm. v. Las Vegas Events,*
28   *Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004) (the court may take judicial notice of the records
     of state agencies and other undisputed matters of public record under Fed. R. Evid. 201).

With respect to the Project at issue in this case, the TRPA's 19-member Advisory Planning Commission ("APC"), which advises the TRPA Governing Board on technical and scientific issues, voted 18 to 1 to recommend that the Governing Board certify the Sierra Colina Village Project Final Environmental Impact Statement ("FEIS") as technically adequate and voted unanimously to recommend that the Governing Board find that the Project's environmental impacts had been reduced to a less than significant level.  (Administrative Record ("AR") 3334, 3496-3503). The 15-member Governing Board (including one non-voting Presidential appointee) voted 12 to 1 to certify the FEIS and 11 to 2 to approve the LPF and multi-family dwelling projects.  (*Id.* at 4458-59, 4508-12).   Prior to TRPA's approvals, the Douglas County Board of Commissioners unanimously approved a development agreement with Sierra Colina committing to transfer over 21,000 square feet of publicly-owned land coverage from the adjacent Kahle Park and Community Center ("Kahle Park") to the Property to assist in the creation of the LPFs, including LPF 3.  (*Id.* at 9680, 9686-9716).

### III.    Sierra Colina Project

Sierra Colina is an 18-acre parcel located in the urban area of Stateline, Nevada. (*Id.* at 5096, 5100, 6771, 7341).  The parcel is bound by U.S. Highway 50 to the west; Lake Village Drive/Echo Drive to the north; a U.S. Forest Service parcel to the east; and Kahle Park to the south. (*Id.* at 4544). Sierra Colina is also located in close proximity to a mix of other office, commercial, retail, and County administration and recreational facilities, including the adjacent commercial Lake Village Professional Building and the 326-home Lake Village subdivision to the north, Kingsbury Middle School to the northeast, and Shady Lane commercial industrial center to the southeast. (*Id.* at 4544, 4657, 4678, 4834, 6771).

The prior owners of the Project property attempted to develop a residential project on the parcel; however, after commencing work on the EIS the owners went into Chapter 11 bankruptcy. On April 27, 2005, Sierra Colina's owners purchased the property from the trustee sale. (*Id.* at 6893).  Shortly after acquiring the property, Sierra Colina's owners began a year-long dialogue with the stakeholders in the community (including the League) to determine local residents' visions for future use of the parcel. (*Id.* at 4212-15, 4651, 8861-65). In April

2006, Sierra Colina submitted applications to TRPA proposing to develop the "Sierra Colina Village." (*Id.* at 246-51).

The Project involves the construction of 50 Leadership in Energy and Environmental Design ("LEED")-certified homes, nine of which will be deed-restricted for moderate income households, a network of LPFs, undergrounding of overhead utility lines, restoration of the unauthorized road and trails traversing the Property including the removal of all 1,900 square feet of existing coverage within the Burke Creek stream environmental zone ("SEZ"), and dedication of 10.7 acres of land to Douglas County for the permanent preservation of open space and public recreational access. (*Id.* at 4838, 4841-42, 4870, 4880, 4886). All portions of the SEZ located on the Property are within the 10.7 acres of open space. (*Id.* at 4836, 4986).

The Project also involves an advanced storm water treatment system including shared, but privately-funded, facilities for treatment of on-site private and off-site public runoff. (*Id.* at 4841, 4870, 4876, 4878). The Project's storm water management system exceeds current regulatory requirements for the discharge of storm water. (*Id.* at 4583, 5070, 5080). Implementation of the Project's storm water system will reduce pollutant loads to Lake Tahoe compared to existing conditions. (*Id.* at 3735, 4583, 4597, 6753-55, 6898).

TRPA staff initially determined that the Project could have significant effects on the environment and, therefore, in August 2006, TRPA retained an environmental consulting firm to prepare an EIS for Sierra Colina. (*Id.* at 4714-7207). TRPA solicited comments on the scope and contents of the EIS and held informal and formal scoping meetings in October and November 2006. (*Id.* at 4726). In August 2008, after nearly two years of study and analysis of the Project's potential impacts, TRPA released a Draft EIS which considered five alternatives, including a no-project alternative and the approved Project. (*Id.* at 4714, 4716). TRPA provided a 60-day public review and comment period and held two public hearings before its Governing Board and APC to solicit comments on the Draft EIS. (*Id.* at 6644). In April 2009, TRPA released the FEIS for the Project which included responses to comments received on the Draft EIS and appropriate revisions to the Draft EIS. (*Id.* at 6644-45).

The FEIS reported that all Project impacts to resources of the Basin, including air quality, water quality and soils, were less than significant, or that implementation of the recommended mitigation measures would reduce Project impacts to less than significant levels. (*Id.* at 3678-79, 3684-90, 7309-12). Moreover, the FEIS disclosed that, as a result of the 10.7 acre open space dedication and implementation of LPFs 2-5, the Project would have beneficial recreational impact. (*Id.* at 5205, 6870). The FEIS concluded that the Project would be developed within the allowable coverage limitations and would include improved drainage, temporary and permanent best management practices, sufficient vehicular site access, emergency access, sufficient parking, undergrounding of a utility line resulting in scenic improvements, building designs that complied with TRPA scenic thresholds, building heights that were consistent with TRPA height standards, native landscaping, and compatible lighting. (*Id.* at 5109). The FEIS concluded that the Project and all of its components were consistent with the Water Quality Management Plan, the Plan Area Statements ("PAS") 73, the TRPA Code of Ordinances, the Goals and Policies of the TRPA Regional Plan, and all other applicable regulations and land use policies. (*Id.* at 5087-88, 5122-23).

The FEIS determined that LPF 3 met TRPA's definition of "linear public facilities." (*Id.* at 4834, 4838, 4857, 4861, 5101, 5110). LPF 3 was a roadway that was linear in nature, would be available to the general public, and would accommodate vehicle, pedestrian, and bicycle travel. (*Id.* at 6741). The FEIS concluded that LPF 3 was the minimum necessary for adequate access and that no other proposed alternatives would reduce land coverage while providing an equal level of public and environmental benefit. (*Id.* at 6667, 6743). The FEIS also concluded that the Sierra Colina Project would have beneficial impacts to:

- water quality, by "reduc[ing] pollutant loads for fine sediment particles by 52%, for total suspended solids by 70%, and for all other pollutants of concern to lake clarity (i.e. phosphorus and nitrogen) by between 28% and 49% relative to the pre-project condition" (*id.* at 3230-31, 4597, 6753-55, 6898, 9678);

- the riparian zone, by reducing existing disturbance to Burke Creek SEZ and protecting a portion of the creek from future development (*id.* at 4984, 4989, 4992);

- traffic, by reducing delay, improving level of service at the Lake Village Drive/U.S. 50 intersection, and improving bicycle and pedestrian trails (*id.* at

6

5257-61);

•   scenic views, by undergrounding electrical lines on the site (*id.* at 3647-48, 5109); and

•   recreation, by creating a 10.7-acre open space area and a network of public trails to fill a gap in the County's pedestrian and bicycle network (*id.* at 4728, 4880-81, 9948).

The FEIS also explained that the network of public trails provided by the Project would:

•   contribute to the regional network of pedestrian/bicycle routes (*id.* at 5112, 5263);

•   reduce dependency on the automobile (*id.* at 5263, 6669);

•   create public pedestrian and bicycle access to area neighborhoods, businesses, public services and recreational facilities (*id.* at 5111-12);

•   reduce vehicular traffic and vehicle-miles-travelled by getting residents and visitors out of cars and onto maintained trails (*id.*);

•   enhance safety of non-vehicular transit between Stateline and Round Hill (*id.*); and

•   reduce disturbance to the SEZ (*id.*).

On June 24, 2009, after extensive public testimony and discussions among its members and staff, the TRPA Governing Board reviewed the conclusions of the FEIS, found that the FEIS was in compliance procedurally and substantively with the Compact, Code, and TRPA Rules of Procedure and certified the FEIS. (*Id.* at 4452-59, 4698, 7309-12).

## IV.   LPF Network

A critical missing link in Douglas County's trail system is the connection of the existing Round Hill bike path, which serves the commercial and dense residential areas one mile north of the Property to the surrounding facilities.  (*Id.* at 4105, 4108, 4857-58, 4161, 9948).  The County recognized that access through the private Sierra Colina parcel was necessary to complete this linkage and proposed to Sierra Colina that the LPF Network, consisting of LPFs 2 through 5, be included as an element of the Project.  (*Id.* at 4465-66, 4425).  The LPF Network which connects Round Hill to the surrounding faciliites is the result of collaboration between Douglas County and Sierra Colina, and the County agreed in the development agreement to share in the cost of the LPF Network by transferring over 21,000 square feet of

publicly-owned coverage to the Project for construction of the LPFs.  (*Id.* at 4105, 4425, 4857-58, 4861, 9689, 9693-94).

The Property contains a portion of an existing LPF, Lake Village/Echo Drive ("LPF 1"). (*Id.* at 4857, 5208).  The Project's LPF Network includes three pedestrian/bicycle paths ("LPFs 2, 4, and 5") and one shared roadway ("LPF 3").  (*Id.* at 4857, 5098,  5208-09).  LPFs 2 through 5 will be created by recorded public easements on the Property and serve the general public as well as residents of Sierra Colina.   (*Id.* at 3705-08, 4857, 4861, 5110).

LPF 1 is the existing Lake Village/Echo Drive, a 1.14-acre area which is located within the 18-acre Property.   (*Id.* at 4857, 5208).  LPF 1 is a 60-foot wide recorded right-of-way maintained by Douglas County which connects U.S. Highway 50 to Kingsbury Middle School and provides access to the Lake Village Professional Building and Lake Village.   (*Id.*).

LPFs 2, 4, and 5 consist of 8-foot wide pedestrian/bicycle paths.   (*Id.* at 4858, 5208). LPF 2 provides a connection between Kahle Park and the existing Round Hill bike path that connects Round Hill to Kingsbury Middle School and to a lower Kingsbury residential subdivision.   (*Id.* at 4859, 5208).  LPF 5 includes an elevated bridge over Burke Creek and connects LPF 3 to Kahle Park.   (*Id.*).  LPF 4 connects LPFs 2 and 5 to U.S. Highway 50 via LPF 3.   (*Id.*).  LPFs 2 and 5 are for the exclusive use of pedestrians and bicyclists.   (*Id.* at 7353-54).  In addition to pedestrian and bike access, LPF 4 provides an alternate means of vehicular access to and through the Property in the event of an emergency.   (*Id.*).  However, LPF 4, based on its size, can only accommodate smaller emergency vehicles such as police cars but not fire engines.   (*Id.* at 4268).

LPF 3 consists of a 20-foot by approximately 1,120-foot shared roadway.   (*Id.* at 4861, 7355-56).  LPF 3 provides public access for pedestrians and bicyclists to other LPFs including Lake Village/Echo Drive (LPF 1) and the roadway serving Kahle Park and Kingsbury Grade (LPFs 4 and 5).   LPF 3 also serves as the residential access road for Sierra Colina and provides access to the dedicated 10.7 acres of open space, both for the public and for operation and maintenance by Douglas County.   (*Id.* at 5110-11, 9696).

### V.    Coverage Requirements

Maximum land coverage (base allowable plus transferred) for LPFs is limited to the minimum amount necessary to achieve their public purpose.  LPFs 2-5 require 31,657 square feet of coverage which will be achieved through a combination of base allowable and transferred coverage.  (*Id.* at 4882, 7353).  No additional coverage is required for LPF 1.  (*Id.* at 4857).  Base allowable coverage for the LPFs is 6,055 square feet, 4,517 square feet which is attributable to LPF 3.  (*Id.* at 4882, 7353).  The remaining 25,602 square feet of coverage needed for the LPFs will be transferred to the Property.  (*Id.* at 4884).  Douglas County will transfer over 21,000 square feet of publicly-owned coverage to support construction of the LPF Network because it "would link the public trail and off road transportation system in the vicinity of the development, which would provide transportation and recreation benefits and improve public safety for pedestrians and cyclists."  (*Id.* at 9686, 9693-94).

Douglas County's contribution of coverage to the LPF Network enables Defendant Sierra Colina, LLC, to construct nine income-restricted homes, pursue LEED certification for all 50 homes, dedicate 10.7 acres to the County for open space, restore the Burke Creek SEZ, fund and construct a treatment facility for public runoff, and provide public access through the Property.  (*Id.* at 4207).  Absent the public-private partnership in the LPFs, the proposed shared roadway (LPF 3) would be private drive.  LPFs 4 and 5 would not be constructed, the residences would be gated with no public access through the site, and the proposed nine moderate-income deed-restricted homes would become market rate homes.  (*Id.* at 4862).

The total size of the Property is 18 acres.  (*Id.* at 4625, 4834).  Approximately two-thirds of the Property, or 10.7 acres, is being transferred to Douglas County and dedicated for permanent open space.  (*Id.* at 4626, 4842).  Of the remaining 7.3 acres, 1.14 acres consists of the existing Lake Village/Echo Drive (LPF 1).  (*Id.* at 4625, 4857).  The new development is confined to an approximately 6.2-acre site, or one-third of the Property.  (*Id.* at 4626).

Sixty-three percent of the 6.2-acre project site will consist of a vegetated common area, while the residential buildings, patios, entry-ways and private drives will occupy approximately 37% of the 6.2-acre site.  (*Id.*).  Although the Property consists of 18 acres, land coverage for

the residential development, including patios and driveways, is limited to approximately 2.3 acres, or 13% of the Property. TRPA has determined that the multi-family dwelling project, which excludes the lands underlying LPFs 2 through 5, is entitled to 87,571 square feet of coverage but only utilizes 85,307 square feet, leaving 2,264 square feet of unused base allowable, or potential, coverage. (*Id.* at 4884).

LPFs 2, 3, 4, and 5 will occupy 0.73 acre, or 4% of the 18-acre Property. (*Id.* at 4625). Of the 0.73 acre, the disputed LPF 3 comprises 0.53 acres (23,012 square feet) or 2.93% of the Property. (*Id.* at 4882). Together, the multi-family dwelling project and LPF projects will cover approximately 14% of the Property. (*Id.* at 7327).

## VI.    TRPA Findings & the FEIS

By certifying the FEIS, the TRPA made the following findings with respect to the Project. The Project was consistent with restoring, maintaining, and improving the quality of the Lake Tahoe Region for visitors and residents of the region because the Project would be built to TRPA design codes and in accordance with the land use regulations set for the project area. (*Id.* at 5098). Additionally, the Project would include a 10.7 acre open space easement and land conveyance to a public entity and involve the construction of three pedestrian/bicycle paths and one shared roadway (the LPF Network) for public use. (*Id.*).

The Project also sought a balance between economic health and the environment because the Project provided housing to Basin employees that may otherwise commute from outside the Basin. (*Id.*). Additionally, the Project provided for moderate-income, deed-restricted work force housing that would be available to local resident families earning not more than 120% of the median income in Douglas County. (*Id.*). The Project was also consistent with the planning area statement, which provided that the "area should continue to be a medium density residential area, maintaining the existing character of the neighborhood." (*Id.*). The community needed reasonably priced homes for its local, middle income workforce of nurses, teachers, firefighters, deputy sheriffs, and others. (*Id.* at 5123). There were zero deed-restricted moderate income homes in Douglas County within the Lake Tahoe Basin. (*Id.*).

The Project was consistent with the Goals and Policies of the TRPA Plan because the Project promoted the infill of development on high capability lands, redirected development to more suitable areas, and avoided the creation of new street networks. (*Id.* at 5098-5100). The Project gave all persons the opportunity to use and enjoy the region's natural resources and amenities by virtue of the conveyance of 10.7 acres of the Project parcel to the public entity for public use and open space. (*Id.* at 5105). The space would be protected in perpetuity from development by a deed restriction or easement. (*Id.*). The LPF Network would be included in the land conveyance and would be intended for public use and access, as would the rest of the open space on the parcel. (*Id.*). The parcel was intended to be held as a permanent open space by the receiving public entity. (*Id.*).

The Project would also have a less than significant impact on the scenic quality ratings established by the TRPA environmental thresholds. (*Id.* at 5108). The Project would also remove, restore and re-vegetate 1,900 square feet of TRPA-verified existing coverage in the SEZ on the Project parcel. (*Id.* at 5116). The voluntary conveyance of the 10.7 acres to the public entity would include 2.4 acres of SEZ (including the portion of Burke Creek on the parcel). (*Id.* at 5117). The remaining 8.3 acres of the conveyance was a Jeffrey pine common forest which would provide a natural buffer to protect the 2.4 acres of SEZ from disturbance associated with surrounding land uses. (*Id.*). Through the deed-restriction and public ownership of the conveyed land, the Sierra Colina SEZ (including the portion of Burke Creek located therein) would be protected in perpetuity from future development for the benefit of the public and of the environment. (*Id.*). Additionally, the project applicant's continued cooperation with Douglas County would reduce runoff and erosion impacts to the site as well as surrounding areas associated with runoff from Lake Village Drive. (*Id.* at 5121).

The Project was consistent with the TRPA's policy of providing for the in-fill of existing areas, making use of existing transportation facilities, and promoting the use of alternative transportation modes. (*Id.* at 5110). Specifically, the LPF Network, including LPF 3, would connect Kahle Park to the Class I bicycle trail east of the Project site and to U.S. Highway 50 and the commercial center southwest of the Project site. (*Id.*). The paths would be available

for use by future residents and the general public.  (*Id.*).  Additionally, LPF 3, as a shared roadway between public pedestrians and bicyclists and the residents and visitors of the Project, was designed to minimize impacts on public transportation, adjacent roadways, intersections, and bicycle/pedestrian facilities.  (*Id.*).  LPF 3 was also consistent with the TRPA's goals and policies of developing and encouraging the use of pedestrian and bicycle facilities as a safe and viable alternative to automobile use and the high priority of constructing pedestrian and bicycle facilities in urbanized areas of the region where reductions in congestion would result.  (*Id.* at 5110-11).  The LPF Network would connect and facilitate future connections to nearby land uses and/or other public use pathways.  (*Id.* at 5111).  The LPF Network also provided bicycle and pedestrian linkages between residential and nonresidential areas.  (*Id.*).  The LPF Network was beneficial to the region because it reduced vehicle motor transmissions by getting residents and visitors out of cars and onto maintained trails; enhanced public safety between Stateline and Round Hill via safe, non-vehicular transit; and created pedestrian and bicycle access for residents, employees, and visitors from area neighborhoods, businesses, public services, and recreational facilities.  (*Id.* at 5112).  The Project would require the transfer of coverage for the site to develop the LPFs, but any land coverage transfer would be consistent with TRPA regulations.  (*Id.* at 5115).  The Project was also consistent with the goal of providing bike trails to provide alternatives for travel in conjunction with transportation systems because the LPF Network would connect with and provide future opportunities for connection with nearby roadways and public use trails in the area.  (*Id.* at 5119).

The Project would promote energy conservation programs and the development of alternative energy sources to lessen dependence on scarce and high-cost energy supplies by specifically seeking to achieve a LEED rating from the U.S. Green Building Council.  (*Id.* at 5118).  LEED certification required advanced energy and resources saving technology to be implemented into the building design.  (*Id.*).  The Project would use environmentally preferable materials and the latest recycled technically and would utilize efficient advanced framing techniques that would reduce waste from framing.  (*Id.*).  The Project was also an Energy Star

Partner and was committed to obtaining Energy Star certification for all of its residential units. (*Id.* at 5119). Energy Star qualified homes were independently verified to ensure that they met strict guidelines for energy efficiency set by the U.S. Environmental Protection Agency. (*Id.*). Energy Star homes were significantly more energy efficient than standard homes because they incorporated a variety of energy-efficient features, including effective insulation, high performance windows, tight construction and ducts, efficient heating and cooling equipment and Energy Star qualified lighting and appliances, all of which contributed to lower energy demand and reduced air pollution. (*Id.*).

The Project was consistent with the Goals and Policies of the Regional Plan and any environmental impact was considered less than significant. (*Id.* at 5120-21, 5124). The Project was consistent with applicable land use plans and policies as well as the Goals and Policies of the Regional Plan and would not contribute to any potential cumulative land use impacts. (*Id.* at 5123).

**LEGAL STANDARD**

**I.    Tahoe Regional Planning Compact**

Article VI(j) of the Compact provides provisions for any "[l]egal actions arising out of or alleging a violation of the provisions of this compact, of the regional plan or of an ordinance or regulation of the agency or of a permit or a condition of a permit issued by the agency." (Compact (#39-2) at 12, 16). Article VI(j)(5) of the Compact provides that for any legal action which challenges an adjudicatory act or decision of the agency to approve or disapprove a project

> the scope of judicial inquiry shall extend only to whether there was prejudicial abuse of discretion. Prejudicial abuse is established if the agency has not proceeded in a manner required by law or if the act or decision of the agency was not supported by substantial evidence in light of the whole record. In making such a determination the court shall not exercise its independent judgment on evidence but shall only determine whether the act or decision was supported by substantial evidence in light of the whole regard.

(*Id.* at 17).

Substantial evidence is "less than a preponderance, but more than a scintilla of evidence." *Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning*

1  *Agency*, 311 F. Supp. 2d 972, 989 (D. Nev. 2004) (internal quotations omitted). "In making

2  this determination, a court views the entire record to see if it contains such relevant evidence

3  as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal

4  quotations omitted). In reviewing the findings of the TRPA, "it is not the function of the Court

5  to weigh the considerable amount of conflicting evidence received by the administrative

6  bodies," but instead the Court's "primary function in reviewing the agency's findings is to

7  determine whether there was substantial evidence to support them." *Cal. Tahoe Regional

8  Planning Agency v. Harrah's Corp.*, 509 F.Supp. 753, 758 (D. Nev. 1981). The fact that the

9  Court may "draw two inconsistent conclusions from the record does not prevent the

10  administrative agency's finding from being supported by substantial evidence." *Good

11  Samaritan Hosp., Corvallis v. Mathews*, 609 F.2d 949, 955 (9th Cir. 1979).

12  **II.    Summary Judgment Standard**

13         Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows

14  that there is no genuine dispute as to any material fact and the movant is entitled to judgment

15  as a matter of law." Fed.R.Civ.P. 56(a). Material facts are "facts that might affect the outcome

16  of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

17  S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is "genuine" if the evidence is such

18  that a reasonable jury could return a verdict for the nonmoving party. *Id.*

19         The moving party bears the initial burden of identifying the portions of the pleadings and

20  evidence that the party believes to demonstrate the absence of any genuine issue of material

21  fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265

22  (1986). A party asserting that a fact cannot be or is genuinely disputed must support the

23  assertion by "citing to particular parts of materials in the record, including depositions,

24  documents, electronically stored information, affidavits or declarations, stipulations (including

25  those made for purposes of the motion only), admissions, interrogatory answers, or other

26  materials" or "showing that the materials cited do not establish the absence or presence of a

27  genuine dispute, or that an adverse party cannot produce admissible evidence to support the

28  fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the

1   motion, the burden shifts to the nonmoving party to come forward with specific facts showing

2   that a genuine issue for trial exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

3   U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

**DISCUSSION**

4

5   **I.      Motions for Summary Judgment**

6              **A.      Plaintiff's Motion for Summary Judgment (#38)**

7              Plaintiff moves for summary judgment on all three causes of action.  (Pl.'s Mot. for

8   Summ. J. (#38) at 5).  Plaintiff argues that the administrative record demonstrates that the

9   primary purpose of LPF 3 is to serve the Project's residents and their guests' need to drive

10  their cars to their individual homes.  (*Id.* at 20).  Plaintiff argues LPF 3 is not designed for

11  pedestrians/bicycles because, if it was, the path would only be 8-feet wide.  (*Id.*).  Plaintiff

12  asserts that even if the interior pedestrian/bicycle paths, LPFs 4 and 5, were not built, the

13  developer would still build the access road.  (*Id.* at 21).  Plaintiff contends that, assuming

14  *arguendo*, that the primary purpose of the access road was to serve other people besides the

15  Project's residents, TRPA's approval of LPF 3 was unlawful because the coverage attributed

16  to the access road and its biking/pedestrian use was not the minimum amount of coverage

17  necessary for that claimed public purpose, which is 8-feet.  (*Id.* at 25).  Plaintiff asserts that

18  because only 8-feet is necessary to allow for pedestrian/bicycle traffic, the TRPA could not

19  rationally find that 22-feet, the entire width of the road designed for cars, was necessary for

20  pedestrian/bicycle use.  (*Id.* at 26).  Plaintiff argues that the TRPA's findings do not support

21  a finding that the road is required to provide access to property other than that owned by the

22  applicant.  (*Id.* at 29).  Plaintiff asserts that there were at least two feasible alternatives that

23  would have reduced coverage including reducing the Project size and creating a separate

24  pedestrian/bicycle path.  (*Id.* at 29-30).

25             Defendants filed oppositions and Plaintiff filed a reply.  (*See* Sierra Colina Def.'s Opp'n

26  to Mot. for Summ. J. (#47); TRPA's Opp'n to Mot. for Summ. J. (#49); Pl.'s Reply to Mot. for

27  Summ. J. (#56)).

28  ///

### B.    Sierra Colina Defendants' Motion for Summary Judgment (#37)

Sierra Colina Defendants move for summary judgment on all counts.  (*See* Sierra Colina Mot. for Summ. J. (#37) at 19).  They assert that, under the plain meaning of the TRPA Code, LPF 3 is a linear public facility.  (*Id.* at 20).  They contend that substantial evidence supports the TRPA's decision to include the entire 20-foot roadway width in the LPF 3 because LPF 3 is a Class III shared-use bicycle and pedestrian route.  (*Id.* at 22-23).  They argue that the 20-foot wide LPF 3 is required for public safety and emergency responders.  (*Id.* at 23-24).  They assert that the LPF Network, including LPFs 2, 3, 4, and 5, facilitate public and quasi-public activities pertaining to transportation, health, and welfare by creating non-vehicular links between commercial, residential, and recreational facilities; providing an emergency ingress and egress; reducing wildfire hazards, and protecting the Burke Creek SEZ.  (*Id.* at 20, 25-27).  They contend that substantial evidence supports the TRPA's coverage transfer findings made pursuant to TRPA Code § 20.3.B(4).  (*Id.* at 27).  With respect to the "no feasible alternative" prong, Sierra Colina Defendants argue that TRPA considered Plaintiff's alternatives during the administrative process and rejected them based on substantial evidence.  (*Id.* at 28-29).  They assert that the Code focuses on whether there is a feasible LPF alternative not whether there is a feasible project alternative.  (*Id.* at 29).  They argue that the unusual configuration for the LPF Network is that it provides a critical connection through private property to other pedestrian/bicycle connections.  (*Id.* at 32-33).  They assert that Plaintiff improperly focuses on who will be primarily served by the roadway instead of who will be primarily served by LPF 3 and improperly focuses on who will primarily be served by LPF 3 in isolation instead of considering who will primarily be served by the LPF Network.  (*Id.* at 33).  They assert that the TRPA was only required to make the four findings in TRPA Code § 20.3.B(4) and that no additional findings are required.  (*Id.* at 35).

Plaintiff filed an opposition and Defendants filed a joint reply.  (*See* Pl.'s Opp'n to Sierra Colina Mot. for Summ. J. (#48, 54); Joint Reply (#55)).

### C.    TRPA's Motion for Summary Judgment (#42)

The TRPA moves for summary judgment on all counts.  (TRPA Mot. for Summ. J. (#42)

at 21).  The TRPA argues that LPF 3 is a linear public facility as a matter of law based on the Code's plain meaning because it pertains to transportation by accommodating vehicle, pedestrian, and bicycle travel; pertains to health and welfare because it provides an emergency ingress and egress, access for fuels reduction, fire reduction, and environmental benefits; and serves both the public and the residents of Sierra Colina.  (*Id.* at 22).  The TRPA asserts that the Code does not prohibit an LPF from serving private users as long as it also serves public or quasi-public uses.  (*Id.* at 23).  The TRPA contends that 20-feet is the minimum width permissible under Code § 24.2E for pedestrian, bicycle, and vehicle use.  (*Id.* at 24).  The TRPA asserts that substantial evidence in the record supports its finding that LPF 3 is a linear public facility of adequate size to serve its public purpose and that its finding is consistent with precedent.  (*Id.* at 24-25).  The TRPA argues that substantial evidence supports its findings to permit the transfer of land coverage for LPF 3.  (*Id.* at 26-34).  The TRPA contends that substantial evidence demonstrates that permitting a transfer of land coverage will not adversely impact water quality.  (*Id.* at 34-35).

Plaintiff filed an opposition and Defendants' filed a joint reply.  (*See* Pl.'s Opp'n to TRPA Mot. for Summ. J. (#48, 54); Joint Reply (#55)).

**D.  Analysis**

In this case, there are two issues before the Court: (1) whether substantial evidence supports the TRPA's finding that the 20-foot wide roadway is a Linear Public Facility as defined by TRPA Code of Ordinances § 2.2 and (2) whether substantial evidence supports the TRPA's finding that the roadway, designated as LPF 3, qualifies for a transfer of land coverage pursuant to TRPA Code of Ordinances § 20.3.B(4).  (*See* Compl. (#1) at 16-22; TRPA's Mot. for Summ. J. (#42) at 9).

**i.  Claim 1:  Linear Public Facilities**

The TRPA Code of Ordinances ("Code")[2] § 2.2 defines the term "Linear Public Facilities" as "[p]ublic service facilities which are linear in nature such as roads, streets, trails,

---

[2]  The full TRPA Code of Ordinances is located on the TRPA website at http://www.trpa.org/default.aspx?tabindex=2&tabid=172.

utility transmission and distribution facilities and other similar right-of-ways.  Also includes accessory uses to such facilities, including without limitation pump houses, lift stations, and access right-of-ways."  (Code (#39-1) at 18).  Code § 2.2 defines "public service" as "public or quasi-public uses or activities pertaining to communication, transportation, utilities, government, religion, public assembly, education, health and welfare, or cultural and civic support.  It does not include such uses or activities that are primarily involved in commercial enterprises."  (*Id.* at 25).

As an initial matter, Plaintiff does not challenge the factual findings made by the TRPA in the FEIS but instead only challenges the application of those findings to the Code.  The TRPA certified the FEIS on June 24, 2009.  (AR 4452-59).  The FEIS and supporting exhibits support the TRPA's finding that LPF 3 is a linear public facility under Code § 2.2 for the following reasons.  First, LPF 3 is linear in nature because it is a road.  (*Id.* at  6741).

Second, the road has public transportation uses.  Specifically, LPF 3 provides for public transportation uses because it provides pedestrian walkways and bike paths for both the general public and the residents of the Sierra Colina Village.  (*Id.* at 4861).  LPF 3 serves as a pedestrian walkway, access road, and bike path that would serve the public and residents by connecting "the residential and commercial areas of the north of the [project] to the recreational, residential, commercial, governmental, and other community resources south and west of the [project].  (*Id.*).  Additionally, an LPF map demonstrates that LPF 3 connects LPF 1 to LPFs 4 and 5, thus, demonstrating that LPF 3 serves a public purpose to connect the public pedestrian/bike users of LPF 1 to the pedestrian/bike pathways located on LPFs 4 and 5.  (*Id.* at 5206).  The FEIS also states that the LPFs would be used by "substantial numbers of surrounding residents, workers, and visitors for transportation and recreation."  (*Id.* at 4861).  Those potential users include: "(i) residents of the adjacent 325-home Lake Village subdivision, (ii) staff of and visitors to the adjacent Lake Village Professional Building, (iii) students at the Kingsbury Middle School, (iv) residents of the Round Hill, lower and mid-Kingsbury and lower Kahle residential areas; and (v) employees, visitors and residents traveling between Nevada Beach and the Round Hill residential and commercial centers on

the one hand, and the Lake Village subdivision, Stateline urban core and Kahle Park areas on the other hand." (*Id.*).

Third, LPF 3 has public health and welfare uses because it provides a fire truck ingress and egress from Lake Village Drive. (*Id.* at 5107). The record demonstrates that "only in the case of emergency, LPFs 3 and 4 may be used as an emergency egress for the general public from Lake Village Drive/Echo Drive areas, or as an emergency ingress for emergency vehicles where access is otherwise severely constrained or inaccessible." (*Id.* at 7353). The project applicant would "work with area emergency services (fire, ambulance, or police) to prepare a plan to determine when and how use of this emergency access would be triggered." (*Id.*).

Additionally, LPF 3 provides a connection to LPF 4 and 5 which will reduce the pedestrian/bike traffic on U.S. Highway 50. (*Id.* at 6743). The FEIS notes that pedestrians and/or bicycle riders have been struck by motor vehicles and injured or killed while using Highway 50 to travel between Stateline and both the Round Hill commercial and residential area and the Elks Point Road/Nevada Beach area. (*Id.* at 6743 n.2).

As such, the record demonstrates that substantial evidence supports the TRPA's classification of LPF 3 as a linear public facility. Accordingly, the Court denies Plaintiff's motion for summary judgment (#38) on the first cause of action and grants Defendants' motions for summary judgment (#37, 42).

### ii.   Claim 2:  Land Coverage

Code § 2.2 defines "land coverage" as a "man-made structure, improvement or covering, . . . that prevents normal precipitation from directly reaching the surface of the land underlying the structure, improvement or covering. Such structures, improvements and coverings include but are not limited to roofs, decks, surfaces that are paved with asphalt, concrete or stone, roads, streets, sidewalks, driveways, parking lots, tennis courts, patios." (Code (#39-1) at 17).   Land coverage also includes "lands so used . . . for such uses as for the parking of cars and heavy and repeated pedestrian traffic that the soil is compacted so as to prevent substantial infiltration." (*Id.* at 17-18).

Code § 20.3 provides land coverage limitations such that "[n]o person shall create land

coverage in excess of the limitations set forth in this chapter." (*Id.* at 48).   Code § 20.3.A

explains base land coverage requirements.  (*See id.* at 49).  Code § 20.3.B provides that land

coverage may be transferred to a parcel and explains which parcels and uses are eligible for

transfer of land coverage.  (*Id.* at 50).  This section of the Code sets the maximum limits for

the aggregate base coverage and coverage transferred.  (*Id.*).  With respect to linear public

facilities and public health and safety facilities, Code § 20.3.B(4) provides the following:

> The maximum land coverage (base coverage plus transferred coverage) for linear public facilities and public health and safety facilities is limited to the minimum amount needed to achieve their public purpose.  Such transfer may be permitted, provided TRPA makes the following findings:
>
> (a)   The project is on the list of additional public service facilities if required pursuant to Section 33.5;
>
> (b)   There is no feasible alternative that would reduce land coverage;
>
> (c)   The project because of its unusual configuration or service requirement, requires special consideration; and
>
> (d)   The facility primarily serves the needs of persons other than those who are, or will be, residents of the lands in question, or the owners of the land in question.

(*Id.* at 52).  Code § 2.2 defines "feasible" as "[c]apable of being accomplished in a successful

manner within a reasonable period of time, taking into account economic, environmental, legal,

social, and technological factors.  (*Id.* at 12).

First, Plaintiff does not dispute Defendants' contention that the TRPA no longer requires

or maintains a list of additional public service facilities, pursuant to Code § 20.3.B(4)(a).  (*See*

Sierra Colina Defs' Mot. for Summ. J. (#37) at 28; TRPA's Mot. for Summ. J. (#42) at 29).

Additionally, the record demonstrates that the TRPA no longer requires or maintains a list of

additional public facilities.  (AR 3719, 7354).  As such, this prong is not at issue.

Second, Plaintiff asserts that there were two feasible alternatives, including (1) reducing

the entire project by 18%, and (2) making a separate 8-foot wide bikeway, that would be

classified as LPF 3, in addition to a 20-foot wide roadway that would not be an LPF.  (Pl.'s Mot.

for Summ. J. (#38) at 30).  With respect to the first alternative, the Code asks whether there

is a feasible alternative LPF not whether there is a feasible project alternative.  *See* Code

§ 20.3.B(4)(b).  As such, the TRPA was not required to consider whether reducing the project as a whole would have reduced land coverage.  Additionally, the record demonstrates that the TRPA did consider five project alternatives and ultimately approved Alternative 1.  (*See* AR 4727-29).

With respect to Plaintiff's second alternative, the TRPA did consider it as an alternative but found it to be not feasible based on economic and environmental factors.  (*Id.* at 7354).  The TRPA considered adding a 4-foot sidewalk to LPF 3 based on public comments.  (*Id.* at 8961).  In response to that inquiry, Brian Shinault, an architect, drafted a letter explaining that they had considered that proposal and that it was not feasible.  (*Id.* at 8961-64).  Specifically, Shinault found that there were physical constraints to adding an additional 4-feet, including: (1) the location of and boundaries between high and low land capability areas on the site; (2) the topography of the parcel, and potential increased scope of excavation, cuts and fills on the site; (3) the existence of rock outcroppings and site features protected under Chapter 30 of the TRPA Code of Ordinances; (4) the Storm Water Management Approach designs along and adjacent to LPF 3, including underground treatment vaults; and (5) the TRPA coverage rules that shaped the design of the site plan for the proposed project and the finite amount of onsite coverage available to the project.  (*Id.* at 6742, 8961).  Shinault also found that it would cost $100,000 plus to design and purchase covering for constructing a 4,400 square foot sidewalk (1,100 feet long by 4 feet wide) along one side of LPF 3.  (*Id.* at 8962).  Additionally, Shinault found that adding a 4-foot sidewalk would create physical, regulatory, and financial difficulties that would eliminate other proposed project public benefits such as moderate income homes.  (*Id.*).  Because adding a separate pedestrian/bike facility would cause the above economic and environmental problems the TRPA found the alternative to be not feasible.  (*Id.* at 7354).  Substantial evidence supports the TRPA's finding that a separate pedestrian/bike facility was not a feasible alternative based on economic and environmental factors.

Third, substantial evidence supports the TRPA's finding that the project requires special consideration because of its unusual configuration in that the LPFs, including LPF 3, provides

a critical bike/pedestrian connection through a privately owned parcel.  The TRPA found that LPF 3 "provide[d] the only possible connection to LPFs 4 and 5, which provide[d] further connection to and from a greater network of local recreation, residential, public service, employment and commercial facilities." (*Id.* at 7355).  The TRPA found that the LPFs would connect the 326 units of the Lake Village condominium project to Kahle Park, Kingsbury Grade, and to nearby community services, commercial establishments and transit. (*Id.* at 6774).  Douglas County supported LPFs 2, 3, 4, and 5 because "the Douglas County trail system ha[d] never been completed" because the most desirable route for the trail to connect the Roundhill/Kingsbury bike trail to the Kahle Park and Recreation Center was through the privately-owned parcel now known as Sierra Colina. (*Id.* at 9676).  "The County ha[d] been waiting for years for a private land owner of this parcel who shared an interest in providing significant public benefits by completing this missing link in [their] trail system." (*Id.*).  Thus, substantial evidence supports the TRPA's finding that the Project has an unusual configuration in that the Project can connect existing bike routes throughout the area.

Finally, substantial evidence supports the TRPA's finding that LPF 3, in conjunction with the LPF Network as a whole, will primarily serve the needs of persons other than those who are, or will be, residents of the land in question.  The TRPA acknowledged that LPF 3 would serve the future Sierra Colina Residents, in addition to existing Lake Village Condominium residents. (*Id.* at 6742).  Additionally, the TRPA recognized that based on LPF 3's connectivity to LPFs 4 and 5, LPF 3 would potentially be used by: "(i) staff and visitors to the adjacent Lake Village Professional Building, (ii) users of the Kingsbury Middle School facilities, (iii) residents of the Round Hill, lower and mid-Kingsbury and lower Kahle residential areas, and (iv) employees, visitors and residents traveling between Nevada Beach and the Round Hill residential and commercial centers, and the Lake Village subdivision, Stateline urban core and Kahle Park areas." (*Id.* at 6743).  The TRPA acknowledged that LPF 3 would provide access to the residents of the proposed Project, but also noted that LPF 3 would connect the residential and commercial areas north of the Project site to the recreational, residential, commercial, governmental, and other community resources south and west of the site. (*Id.* at

4861, 6743).  The TRPA found that LPF 3 would serve approximately 50 homeowners living on the project parcel and that residents and guests would be limited in number.  (*Id.* at 4861, 7355).  The TRPA found that the LPFs, including LPF 3, would serve the members of the public at large because the LPFs functioned as a key component in connecting the area.  (*Id.* at 7355).  The record demonstrates that there are "several thousand people" living in lower Kingsbury, down Kahle Drive, in Elk Point, in Round Hill, and the Lake Village Condominium area.  (*Id.* at 4416).

On the other hand, Plaintiff points out that the only vehicle access to the Project site is on LPF 3 and that LPF 3 is expected to generate 500 daily vehicle trips by residents.  (*See id.* at 4727, 6927).  The record demonstrates that five percent of the Project residents are expected to make their trips via public transportation, foot, or bike.  (*Id.* at 486).

Although the record demonstrates that the residents of the Project will use LPF 3 significantly to access their homes, the record does not demonstrate that they will be the only people using LPF 3.  The record demonstrates that LPF 3 is the key component to connecting the existing pedestrian/bike trails in the region and, thus, LPF 3 serves the needs of people other than those who will be residents of the project.  Additionally, Plaintiff does not dispute that there are a finite number of residents associated with the Project and that there are several thousand others in the surrounding community.  Therefore, substantial evidence supports the TRPA's conclusion that LPF 3 primarily serves the needs of persons other than those who will be residents of the Project because the surrounding community would use LPF 3 to connect to the other pedestrian/bike trails in the community.

Accordingly, substantial evidence supports the TRPA's finding that LPF 3 satisfied the transferred land coverage requirements of Code § 20.3.B(4).  Therefore, the Court denies Plaintiff's motion for summary judgement (#38) on the second cause of action and grants Defendants' motions for summary judgment (#37, 42).  Because Plaintiff's third cause of action is dependent upon the success of its first two causes of action, the Court denies Plaintiff's motion for summary judgment for the third cause of action and grants Defendants' motions for summary judgment in its entirety.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.     **Tyrone Polastri's Motion to File an *Amicus Curiae* Brief (#58)**

Tyrone Polastri, founder of the Lake Tahoe Bicycle Coalition ("LTBC") moves to file an *amicus curiae* brief with this Court in support of the TRPA and the Sierra Colina Defendants. (Mot. to File Amicus Curiae (#58) at 2; Amicus Brief (#58-1)).  In the amicus brief, Polastri states that he supports the efforts by Defendants to create public bicycle and pedestrian trails through the Sierra Colina parcel.  (Amicus Brief (#58-1) at 2).  He quotes a letter, dated June 1, 2009, that he had submitted to the TRPA during a public hearing for this Project.  (*Id.* at 5).  He asserts that, according to Sierra Colina's environmental impact statement, if Plaintiff were to prevail in this litigation the consequence would be the loss of bicycle trails on the Sierra Colina parcel.  (*Id.* at 6).

Plaintiff does not oppose the *amicus* brief but notes that some of Polastri's brief refers to matters outside of the administrative record and that the June 2009 letter is in the administrative record.  (Pl.'s Response (#59)).

"There is no inherent right to file an amicus curiae brief with the Court. It is left entirely to the discretion of the Court."  *Long v. Coast Resorts, Inc.*, 49 F.Supp.2d 1177, 1178 (D. Nev. 1999).  "This is true notwithstanding the fact that the parties may have consented, or do not object, . . . , particularly where the applicant's only concern is the manner in which this Court will interpret the law."  *Id.*  A court may grant leave to appear as an *amicus* if the information offered is timely and useful.  *Id.*

In this case, the Court grants Polastri's motion to file an *amicus curiae* brief (#58) but notes that this Court's review of the brief is limited to the content contained in the administrative record.

III.    **Plaintiff's Motion for Permanent Injunction (#41)**

Plaintiff moves for a permanent injunction on the grounds that, after the Court grants its motion for summary judgment, there are no issues remaining in this case.  (Mot. for Permanent Injunction (#41)).  Because the Court denies Plaintiff's motion for summary judgment in its entirety, the Court denies Plaintiff's motion for permanent injunction (#41) on grounds that it cannot demonstrate that it is likely to succeed on the merits.

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that Sierra Colina Defendants' Motion for Summary Judgment (#37) is GRANTED in its entirety.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (#38) is DENIED in its entirety.

IT IS FURTHER ORDERED that Plaintiff's Motion for Permanent Injunction (#41) is DENIED.

IT IS FURTHER ORDERED that Defendant TRPA's Motion for Summary Judgment (#42) is GRANTED in its entirety.

IT IS FURTHER ORDERED that Tyrone Polastri's Motion for Leave to File an *Amicus Curiae* Brief (#58) is GRANTED.

The Clerk of the Court shall enter judgment accordingly.


DATED: This 29th day of August, 2011.

_____
United States District Judge

25